OLETA HUTSON                          )
                                     )
      Plaintiff,                   )
                                     )
    vs.                              )          Case No. 4:12CV1406 RWS(LMB)
                                     )
CAROLYN COLVIN,                      )
Acting Commissioner of Social Security,  )
                                     )
      Defendant.                   )

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision

denying the application of Oleta Hutson for Disability Insurance Benefits under Title II of the

Social Security Act. The cause was referred to the undersigned United States Magistrate Judge

for a Report and Recommendation pursuant to 28 U.S.C. § 636 (b). Plaintiff has filed a Brief in

Support of Plaintiff's Complaint. (Document Number 13). Defendant has filed a Brief in Support

of the Answer. (Doc. No. 20). Plaintiff has filed a Reply. (Doc. No. 21).

**Procedural History**

On May 20, 2009, plaintiff filed her application for benefits, claiming that she became

unable to work due to her disabling condition on June 18, 2005.[1] (Tr. 145-51). Plaintiff's claim

was denied initially. (Tr. 77). On October 26, 2010, following an administrative hearing, an

---

[1]Plaintiff amended her alleged onset of disability date to July 24, 2007 at the hearing. (Tr. 37).

Administrative Law Judge ("ALJ") issued a partially favorable decision. (Tr. 10-22). The ALJ found that, beginning August 1, 2009, plaintiff was disabled. (Id.). Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration (SSA), which was denied on June 22, 2012. (Tr. 6, 1-5). Thus, the decision of the ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

### A.    ALJ Hearing

Plaintiff's administrative hearing was held on September 17, 2010. (Tr. 31). Plaintiff was present by video teleconference, and was represented by counsel. (Id.).

The ALJ indicated that he wanted to raise the issue of the onset of plaintiff's alleged disability. (Tr. 34). The ALJ stated that he was "concerned about how long [plaintiff] has been in the condition that she appears to be in at this time." (Tr. 35). Plaintiff's attorney stated that the medical records support a 2007 onset, and noted that records from 2006 reveal hallucinations and suicidal ideations. (Id.). Plaintiff's attorney stated that, plaintiff "might be better now than she was then." (Id.).

In his opening statement, plaintiff's attorney argued that plaintiff was disabled due to her combination of a comminuted[2] fracture of the right dominant hand, back problems, hearing problems, and psychiatric problems. (Tr. 36). Plaintiff's attorney stated that plaintiff graduated last in her high school class, and that the consultative psychologist estimated plaintiff's

---

[2]Broken into several pieces. Stedman's Medical Dictionary, 415 (28th Ed. 2006).

intelligence as borderline intellectual functioning.[3] (Id.). Plaintiff's attorney indicated that there are no IQ scores in the record, and no special education records, although plaintiff reported that she was in special education in grade school. (Tr. 37).

The ALJ examined plaintiff, who testified that she was forty-nine years of age and that she graduated from high school. (Tr. 38-39).

Plaintiff stated that she worked at a shoe factory operating a machine that trimmed material off the soles of shoes from 1990 to 1998. (Tr. 39-40).

Vocational expert Byron Pettingil testified that plaintiff's position at the shoe factory is classified as "shoe cutter operator" in the Dictionary of Occupational Titles ("DOT"). (Tr. 42). Mr. Pettingil stated that this position is light and semi-skilled. (Id.).

Plaintiff testified that she worked binding books at a book-binding company from 1999 to 2005. (Tr. 43). Plaintiff stated that she operated a machine that tore covers off books and replaced the covers at this position. (Tr. 44).

Mr. Pettingil testified that plaintiff's book-binding position is classified as "book binder, printing and publishing," and is semi-skilled and medium. (Id.).

Plaintiff testified that she had "a little trouble" performing the book binding job at the time. (Tr. 46). Plaintiff stated that she quit this position because she was unable to use her right hand. (Id.).

Plaintiff stated that she has not worked at all since July of 2007. (Id.). Plaintiff testified that she stopped working because she became depressed, stressed out, and started experiencing

---

[3]Borderline intellectual functioning is defined as an IQ in the 71-84 range. See Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 684 (4th Ed. 1994).

anxiety attacks and panic attacks.  (Tr. 47).  Plaintiff stated that she experienced mental health

problems when she was working at the book binding position.  (Id.).  Plaintiff testified that she

left the position due to a combination of her hand impairment and her mental health problems.

(Id.).  Plaintiff stated that the position was too stressful.  (Tr. 48).

When asked whether she could perform a job that is not as fast-paced and stressful as her

last position, plaintiff stated "I don't know."  (Id.).

The ALJ noted that plaintiff was taking a long time to respond to his questions and

inquired whether this was natural or whether she was "faking it."  (Id.).  Plaintiff stated that this

was natural, and that she was "just a little bit nervous," confused, and shy.  (Tr. 48-49).  The ALJ

stated that plaintiff appeared almost "catatonic," and asked whether she was taking medication.

(Tr. 49).  Plaintiff stated that she was taking Paxil,[4] Wellbutrin,[5] and Trazodone.[6]  (Id.).  Plaintiff

acknowledged that these medications slowed her down cognitively.  (Id.).

The ALJ noted that plaintiff's attorney previously stated that plaintiff's condition was

worse in the past.  (Tr. 50).  The ALJ asked plaintiff's counsel, "how does it get much worse than

this?"  (Id.).  Plaintiff's attorney clarified that plaintiff's hallucinations have improved, possibly

due to the medications she takes.  (Id.).  Plaintiff's attorney stated that plaintiff takes about three

additional medications that she did not mention.  (Id.).  Plaintiff's attorney stated that plaintiff

---

[4]Paxil is an antidepressant indicated for the treatment of major depressive disorder, panic disorder, and generalized anxiety disorder.  See Physician's Desk Reference (PDR), 1536-37(63rd Ed. 2009).

[5]Wellbutrin is an antidepressant drug indicated for the treatment of major depressive disorder.  See PDR at 1649.

[6]Trazodone is an antidepressant drug indicated for the treatment of depression and other mood disorders.  See WebMD, http://www.webmd.com/drugs (last visited June 10, 2013).

responds to his questions in the same manner as she was responding to the ALJ during the hearing. (Id.).

The ALJ resumed questioning plaintiff, who testified that she was married and has two grown children. (Tr. 52). Plaintiff stated that one child, who is twenty-seven years of age, lives with her. (Id.).

Plaintiff testified that someone helps her clean her house because she is unable to grip anything to sweep or mop. (Id.). Plaintiff's attorney noted that the Disabled Citizens Alliance pays for plaintiff's housekeeping service. (Tr. 53).

Plaintiff testified that she drives infrequently, and only for short distances. (Id.). Plaintiff stated that she drives about once a week. (Id.).

Plaintiff testified that she receives mental health treatment, which is helping her. (Tr. 55). Plaintiff stated that her medications help, but she does not believe she could handle a full-time job due to the stress and anxiety she feels when being around people. (Id.).

Plaintiff testified that she has difficulty walking due to back pain. (Id.). Plaintiff stated that she was in "a little bit of pain" sitting during the hearing due to lower back pain. (Tr. 56).

Plaintiff testified that she does not do any household chores. (Id.). Plaintiff stated that her husband cooks. (Id.).

Plaintiff testified that she shops for groceries with her husband but she never goes alone. (Id.). Plaintiff stated that she drives her son to doctor appointments alone. (Tr. 57). Plaintiff testified that her son is schizophrenic. (Id.).

Plaintiff stated that she spends her days watching television and looking out the window. (Id.). Plaintiff testified that she loses concentration when watching television. (Id.). Plaintiff

stated that her husband works during the day. (Tr. 58). Plaintiff testified that she makes herself a sandwich for lunch. (Id.).

Plaintiff's attorney examined plaintiff, who testified that she watches television for a total of about one hour a day, and she sleeps and looks out the window the rest of the day. (Id.). Plaintiff stated that she thinks about her past when she looks out the window. (Tr. 59).

Plaintiff testified that she was sexually abused as a child, and that she has flashbacks about the abuse. (Id.). Plaintiff stated that she experiences about three flashbacks a week that last for about fifteen minutes. (Id.). Plaintiff testified that she was not sure when the flashbacks began, but she has been experiencing them at least three years. (Tr. 60).

Plaintiff stated that she feels anxious when she is around crowds of people, such as when she goes to Wal-Mart with her husband. (Id.). Plaintiff testified that her case manager, Anna, drove her to the hearing. (Id.). Plaintiff stated that Anna drives her to other appointments as well. (Tr. 61). Plaintiff testified that she was nervous during the two-and-a-half-hour drive to the hearing. (Id.).

Plaintiff testified that she has asthma, and that she uses an Albuterol[7] inhaler and an Advair[8] inhaler to help with her breathing. (Id.). Plaintiff stated that she feels better about twenty minutes after using her inhalers. (Tr. 62). Plaintiff testified that she just sits down until her medication starts working. (Id.). Plaintiff stated that she does not smoke. (Id.).

Plaintiff testified that she experiences thoughts of suicide about twice a week, which last

[7]Albuterol is a bronchodilator indicated for the treatment of shortness of breath in patients with asthma and COPD. See PDR at 845.

[8]Advair contains a corticosteroid and is indicated for the maintenance treatment of asthma and COPD. See PDR at 1276.

for about ten minutes.  (Id.).

Plaintiff stated that she experiences hallucinations at least once a week.  (Id.).  Plaintiff testified that she sees people and hears voices.  (Tr. 63).  Plaintiff stated that the voices tell her to hurt herself.  (Id.).  Plaintiff testified that she has never hurt herself, and that she is sometimes able to ignore the voices.  (Id.).  Plaintiff stated that she hears voices less than when she started treatment at Pathways three to four years prior to the hearing.  (Id.).  Plaintiff testified that she talks to Dr. Maria Domanska about the voices.  (Id.).

Plaintiff stated that she has difficulty hearing occasionally.  (Id.).

Plaintiff testified that she does not go anywhere other than taking her son to the doctor, going to the grocery store with her husband, and attending doctor appointments.  (Tr. 64).

Plaintiff stated that she did not remember what happened to her right hand when it was injured.  (Id.).  Plaintiff testified that when she went back to work after injuring her hand, she was unable to lift the books or wipe them off because this process required two hands.  (Id.).  Plaintiff stated that she left her job two weeks after injuring her hand.  (Id.).

Plaintiff testified that she was also experiencing depression when she left her job.  (Id.).  Plaintiff stated that she did not want to be around people and was unable to handle the job.  (Id.).  Plaintiff testified that she felt as if she did not deserve to have the job because she was not good enough to hold a job.  (Tr. 65).

Plaintiff stated that she started treatment at Pathways in May of 2006.  (Id.).  Plaintiff testified that she saw a psychiatrist in Union, Missouri for about one year prior to starting treatment at Pathways.  (Id.).  Plaintiff stated that she started seeing a psychiatrist after she was hospitalized for attempting suicide.  (Tr. 65-66).  Plaintiff testified that she switched to Pathways

because her doctor in Union left the area. (Tr. 66).

The ALJ examined the vocational expert, who testified that plaintiff would be unable to perform any of her past relevant work if she were precluded from semi-skilled work. (Tr. 67).

The ALJ asked Mr. Pettingil to assume a hypothetical claimant with plaintiff's background and the following limitations: able to perform light work; no climbing of ladders, ropes, or scaffolds; no crawling; frequent, not continuous, handling and fingering with the right hand in a right-hand dominant person; no exposure to excessive noise; only occasional exposure to hazards; only occasional exposure to dusts, fumes, and gases; able to understand, remember, and carry out short, simple instructions while performing routine, predictable work, not in a fast-paced production environment; can make simple decisions; and should have no contact with the general public, and only occasional contact with co-workers. (Tr. 67-68). Mr. Pettingil testified that the individual could perform other light, unskilled work, such as: clothing sorter (120,000 positions nationally, 600 in Missouri); laundry folder (60,000 nationally, 300 in Missouri); and merchandise marker (40,000 nationally, 200 in Missouri). (Tr. 68-69).

Mr. Pettingil testified that the individual would not be capable of full-time employment if she would miss three or more workdays a month. (Tr. 69). Mr. Pettingil testified that an individual who was off-task twenty percent of the time would be incapable of full-time employment. (Id.). Finally, Mr. Pettingil stated that a limitation of no contact with co-workers is inconsistent with full-time employment. (Tr. 70).

## B.  Relevant Medical Records

The record reveals plaintiff was treated at Missouri Baptist Hospital-Sullivan on June 18, 2005, for injuries sustained in a motor vehicle accident. (Tr. 387-98). X-rays of plaintiff's right

wrist revealed a displaced impacted fracture of the distal radius, which appeared comminuted. (Tr. 392).

Plaintiff presented to Pathways on May 3, 2006, at which time it was noted that plaintiff had been in a "bad car accident" in June 2005. (Tr. 473). It was noted that plaintiff had severe depression, and that she had suffered from depression most of her life. (Tr. 474). Plaintiff had moderate anxiety, and she had had extreme anxiety for a couple years. (Id.). Plaintiff had mild panic, and it was noted that plaintiff had been experiencing panic attacks for about two years when she gets upset or is in a crowd. (Id.). Plaintiff started experiencing hallucinations related to her past abuse two years prior, which were described as mild. (Id.). Plaintiff had not experienced any hallucinations for months because she had been taking Risperdal.[9] (Id.). Upon mental status examination, plaintiff was hyperactive/excessively fidgety, her mood was dysphoric, her affect was depressed, her memory was impaired, her insight was poor, and she reported visual and auditory hallucinations. (Tr. 475). Plaintiff had one psychiatric inpatient admission due to a suicide attempt in March 2004. (Tr. 477). Plaintiff had received outpatient services following her hospitalization, but her psychiatrist was moving out of the area in June 2006. (Id.). Plaintiff was diagnosed with major depressive disorder,[10] post-traumatic stress disorder ("PTSD"),[11] and was

---

[9]Risperdal is an antipsychotic drug indicated for the treatment of schizophrenia. See PDR at 1753-54.

[10]A mental disorder characterized by sustained depression of mood, anhedonia, sleep and appetite disturbances, and feelings of worthlessness, guilt, and hopelessness. Stedman's at 515.

[11]Development of characteristic long-term symptoms following a psychologically traumatic event that is generally outside the range of usual human experience; symptoms include persistently re-experiencing the event and attempting to avoid stimuli reminiscent of the trauma, numbed responsiveness to environmental stimuli, a variety of autonomic and cognitive dysfunctions, and dysphoria. Stedman's at 570.

assessed a current GAF score of 48.[12]  (Tr. 479).

Plaintiff saw Garth S. Russell, M.D., at Columbia Orthopaedic Group, on June 9, 2006. (Tr. 228-36).  Plaintiff reported right wrist pain and low back pain as a result of injuries she sustained in a June 18, 2005 motor vehicle accident.  (Tr. 228).  Dr. Russell noted that plaintiff underwent an open reduction and internal fixation of a fractured right wrist performed by Dr. Stricker in St. Louis.  (Id.).  Plaintiff was released from Dr. Stricker's care in May 2006.  (Tr. 229).  Plaintiff received no treatment for her lower back pain.  (Id.).  Plaintiff reported continued pain in the right wrist, which is aggravated by lifting, and causes her to drop things frequently; and occasional numbness in her fingers.  (Id.).  Plaintiff reported continued pain in her lower back, which goes into her hips but not down her lower extremities, and is aggravated by sitting or standing.  (Id.).  Upon examination, plaintiff sat mainly on her right buttock and moved from side to side, plaintiff walked hesitantly at first but eventually began to walk with essentially a normal gait, and plaintiff could heel-and-toe walk.  (Tr. 229).  Examination of plaintiff's back revealed some excessive lordosis,[13] moderate muscle spasm in the dorsolumbar muscles, some tenderness over the lumbosacral region, negative straight leg raising, and no evidence of nerve root pressure. (Tr. 229-30).  Examination of plaintiff's right wrist revealed loss of motion and loss of grip strength.  (Tr. 230).  Plaintiff underwent x-rays of the lumbar spine, which revealed excessive

---

[12]A GAF score of 41 to 50 indicates "serious symptoms" or "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  DSM-IV at 32.

[13]An anteriorly convex curvature of the vertebral column.  Stedman's at 1119.

lordosis, and grade I spondylolisthesis[14] at L5-S1 with forward slip.  (Id.).  X-rays of the

dorsolumbar area revealed scoliosis to the left in the thoracic area with a pelvic tilt to the right.

(Id.).  X-rays of the right wrist revealed that she had had a comminuted fracture of the distal

radius with joint disruption.  (Id.).  The angle of the wrist had maintained fairly well, but

degenerative changes were noted.  (Id.).  Dr. Russell diagnosed plaintiff with: comminuted,

displaced fracture, right distal radius; open reduction, internal fixation secondary to above; carpal

tunnel syndrome, right wrist secondary to above; and acute and chronic lumbosacral strain,

superimposed upon pre-existing spondylolisthesis, healed with moderate residual impairment.

(Tr. 233).  Dr. Russell stated that plaintiff's wrist fracture left her with significant loss of motion

and strength in the right, dominant wrist.  (Tr. 234).  Dr. Russell noted that plaintiff also

experiences intermittent numbness to her fingers and that Dr. Stricker had diagnosed plaintiff with

carpal tunnel syndrome[15] secondary to the fracture.  (Id.).  Dr. Russell stated that, in his opinion,

plaintiff would eventually need surgical decompression.  (Id.).  Dr. Russell expressed the opinion

that plaintiff sustained a permanent, partial impairment of twenty percent of the right upper

extremity.  (Id.).  Dr. Russell stated that plaintiff's acute and chronic lumbosacral strain is made

much more severe secondary to the fact that she has a congenital absence of two of the main

support bones in the lower back with a spondylolysis[16] and forward slipping at the L5-S1 area.

---

[14]Forward movement of the body of one of the lower lumbar vertebrae on the vertebra
below it, or on the sacrum.  Stedman's at 1813.

[15]The most common nerve entrapment syndrome, characterized by paresthesias, typically
nocturnal, and sometimes sensory loss and wasting in the median nerve distribution in the hand.
Stedman's at 1892.

[16]Degeneration or deficient development of a portion of the vertebra.  See Stedman's at
1813.

(Tr. 235).  Dr. Russell stated that plaintiff's back impairment permanently restricts her ability to stand, sit, or put any stress on her lower back.  (Id.).  Dr. Russell expressed the opinion that plaintiff would be unable to pursue gainful employment.  (Id.).

Plaintiff presented to Pathways on August 11, 2006.  (Tr. 482-92).  Plaintiff was diagnosed with major depressive disorder and PTSD, and was given a GAF score of 52.[17]  (Tr. 490).  It was noted that plaintiff began having serious symptoms about two years prior, and had been in treatment since that time.  (Tr. 491).  The examiner stated that plaintiff has anxiety and it is questionable if her psychosis is from PTSD.  (Id.).  It was noted that plaintiff's psychiatrist was moving out of the area in June, and that plaintiff would be placed in the Community Psychiatric Rehabilitation Center ("CPRC") program with Frank Tatkenhorst, CSS, and medication management with Dr. Domanska.  (Id.).

Plaintiff presented to Maria Domanska, M.D. at Pathways for a diagnostic evaluation on August 30, 2006.  (Tr. 495-501).  Plaintiff reported a history of depression, with symptoms of crying spells, sleep problems, mood swings, visual hallucinations, suicidal ideations, memory problems, and difficulty concentrating.  (Tr. 495-96).  Dr. Domanska diagnosed plaintiff with major depressive disorder, recurrent with psychiatric features; and PTSD; with a GAF score of 50.  (Tr. 499).  Dr. Domanska continued plaintiff's Wellbutrin, Klonopin,[18] and Trazodone; and increased her dosages of Paxil and Risperdal.  (Id.).

Plaintiff saw Dr. Domanska for follow-up on October 10, 2006, at which time plaintiff

---

[17]A GAF score of 51-60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  DSM-IV at 32.

[18]Klonopin is indicated for the treatment of panic disorder.  See PDR at 2639.

reported that she was feeling better. (Tr. 296). Plaintiff was less depressed, with better self-esteem, and her sleep and appetite were good. (Id.). Plaintiff denied any hallucinations. (Id.). Plaintiff's medications were continued. (Id.). On November 7, 2006, plaintiff denied feeling depressed but felt tired, denied mood swings, had a full range of affect, her sleep and appetite were good, and she denied experiencing any hallucinations. (Tr. 298). On December 5, 2006, plaintiff continued to deny experiencing depression or hallucinations, and reported that her energy level was better. (Tr. 300). On January 2, 2007, plaintiff reported that she occasionally feels down but in general denied feeling depressed. (Tr. 302). Plaintiff continued to deny hallucinations. (Id.). On January 30, 2007, plaintiff reported occasionally feeling depressed, and experiencing some mood swings and anxiety. (Tr. 304). Plaintiff also reported hearing voices occasionally over the past two weeks. (Tr. 304). Plaintiff continued to deny hallucinations. (Id.). Dr. Domanska increased plaintiff's dosage of Risperdal and Klonopin. (Id.). On February 27, 2007, plaintiff reported feeling depressed and anxious occasionally, and that she was mostly worried about her son. (Tr. 306). On April 10, 2007, plaintiff continued to report depression and anxiety related to her son. (Tr. 308). On June 14, 2007, plaintiff reported that she was still feeling depressed and experienced some anxiety. (Tr. 310). Dr. Domanska increased plaintiff's dosage of Paxil. (Id.). On June 28, 2007, Dr. Domanska noted that plaintiff was feeling less depressed than before but worried a lot about her son. (Tr. 312). Plaintiff reported experiencing auditory hallucinations, specifically plaintiff reported hearing stories from the television in her head. (Id.). On August 3, 2007, plaintiff reported feeling down, but mostly anxious. (Tr. 314). Plaintiff denied experiencing hallucinations. (Id.). Dr. Domanska recommended increasing plaintiff's dosage of Klonopin to better address her symptoms. (Id.).

Plaintiff underwent an annual assessment at Pathways on August 27, 2007. (Tr. 524-36). Plaintiff reported that her depression had slightly improved over the last year, which she attributed to coping skills she has developed in coordination with her medications. (Tr. 525). Plaintiff reported that she still experiences pain, which complicates her depression. (Id.). Plaintiff reported moderate anxiety, which had not changed in intensity or frequency in the past year. (Id.). Plaintiff reported that she still has panic attacks, but she could not recall her most recent one. (Tr. 526). Plaintiff denied any current difficulty with hallucinations or flashbacks. (Id.). Upon mental status examination, plaintiff's mood was within normal limits; her affect was constricted, flat, and blunted; and her memory was impaired. (Tr. 526-27). Plaintiff was diagnosed with major depression with psychotic features, PTSD, and a GAF score of 50. (Tr. 532-33). It was noted that plaintiff reported improvement in personal areas of functioning but described her relationship with her son a deteriorating interaction. (Tr. 533). Plaintiff was to continue receiving CPRC services with Frank Tatkenhorst and medication management with Dr. Domanska. (Id.).

On September 13, 2007, plaintiff denied feeling depressed, but reported that she worries about her son. (Tr. 316). Dr. Domanska discontinued the Risperdal and started plaintiff on Abilify.[19] (Id.). On October 11, 2007, plaintiff reported feeling down, worrying a lot, having some anxiety, and occasionally feeling hopeless. (Tr. 318). On November 7, 2007, plaintiff denied feeling down but reported feeling overwhelmed some days. (Tr. 320). On December 12, 2007, plaintiff reported feeling down, worried, and frustrated. (Tr. 322). On January 16, 2008,

---

[19]Abilify is an antipsychotic drug indicated for the treatment of schizophrenia, bipolar disorder, and major depressive disorder. See PDR at 881.

and April 4, 2008, plaintiff denied feeling depressed. (Tr. 412, 414). On May 15, 2008, plaintiff denied feeling depressed, but worried about her son, and reported not feeling safe around him. (Tr. 416). Dr. Domanska increased plaintiff's dosage of Trazodone. (Id.). On July 3, 2008, plaintiff denied feeling depressed, but her mood was less stable. (Tr. 418). Plaintiff was more emotional, irritable, and did not feel safe around her son. (Id.).

Plaintiff underwent an annual assessment at Pathways on August 6, 2008, performed by Lucretia Whited, MA, a CPRC supervisor. (Tr. 420-32). Plaintiff reported experiencing visual and auditory hallucinations about once a week, during which she heard or saw people that were not there and the voices say a name. (Tr. 421). Plaintiff reported experiencing panic attacks about twice a week, which were triggered when she gets upset or nervous. (Id.). Plaintiff reported that her anxiety had improved. (Tr. 422). Plaintiff indicated that her depression had gone from severe to mild due to Fran Tatkenhorst, MA, and her medication. (Id.). Upon mental status examination, plaintiff was excessively fidgety; her mood was within normal limits; her affect was constricted, flat, and blunted; and her memory was impaired. (Id.). Plaintiff's diagnoses remained unchanged. (Tr. 428). Plaintiff was given a GAF score of 50. (Tr. 429).

On August 26, 2008, plaintiff reported being worried and concerned about her son, experiencing mood swings, and anxiety. (Tr. 433). Dr. Domanska increased plaintiff's dosage of Abilify to better address her symptoms. (Id.). On September 24, 2008, plaintiff continued to report worrying a lot about her son, but indicated that her mood was generally stable. (Tr. 323).

Plaintiff presented to Tammy Bartholomew, NP on October 9, 2008, with complaints of shortness of breath and cough, migraines, epigastric pain and nausea, depression, and anxiety. (Tr. 250). On psychiatric exam, it was noted that plaintiff's affect was depressed, she had a poor

attention span and concentration characterized as a "slow response," and did not have suicidal ideation. (Tr. 252). Plaintiff was diagnosed with uncontrolled extrinsic asthma,[20] chronic migraines, esophageal reflux, chronic depressive disorder, and anxiety state NOS. (Tr. 253).

On October 28, 2008, plaintiff presented to Dr. Domanska for follow-up, at which time she reported that her depression was under control, although she still worried about her situation at home. (Tr. 324). On December 3, 2008, plaintiff reported that she was more depressed, although her anxiety was under control. (Tr. 326). Plaintiff's insight and judgment were fair. (Id.).

Plaintiff presented to M. Akhtar Choudhary, M.D. on December 5, 2008, with complaints of headaches and hand numbness. (Tr. 355-56). Plaintiff reported a history of headaches on and off, which had increased progressively to almost daily, last all day, and are accompanied by nausea, sensitivity to noise, and sensitivity to light. (Tr. 355). Plaintiff's headaches were aggravated with stress, and she was not sleeping well. (Id.). Plaintiff reported numbness and tingling in her hand, which had increased progressively, and was aggravated with holding things. (Id.). Upon examination, Dr. Choudhary noted mild weakness in her hand grip. (Tr. 356). Dr. Choudhary indicated that plaintiff also seemed to have carpel tunnel syndrome. (Id.). The doctor noted no abnormalities on neurological examination. (Id.). Dr. Choudhary prescribed Fioricet[21]

---

[20]Bronchial asthma resulting from an allergic reaction to foreign substances, such as inhaled aeroallergens, pollens, dust mites, or mold. See Stedman's at 170.

[21]Fioricet is indicated for the treatment of tension headaches. See WebMD, http://www.webmd.com/drugs (last visited June 10, 2013).

and Topamax[22] for plaintiff's headaches, and ordered a nerve conduction study of the upper extremities.  (Id.).  Plaintiff underwent a nerve conduction study on January 9, 2009, which was consistent with mild bilateral carpal tunnel syndrome, left more than right.  (Tr. 359).

Plaintiff saw Dr. Domanska on January 14, 2009, at which time plaintiff denied feeling depressed, and stated that her mood was stable lately and her anxiety was under control.  (Tr. 328).  On March 19, 2009, plaintiff denied feeling depressed, but reported she has some mood swings.  (Tr. 330).  Plaintiff indicated that her anxiety was under control.  (Id.).

Plaintiff underwent a right tympanoplasty[23] performed by Albert Marchiando, M.D. on April 23, 2009, due to a diagnosis of right eardrum perforation.  (Tr. 339-40).  Plaintiff tolerated the procedure well.  (Id.).  On May 28, 2009, an audiogram demonstrated improved hearing in the right ear.  (Tr. 336).  Dr. Marchiando was pleased with plaintiff's progress.  (Id.).

Plaintiff underwent a sleep study on May 14, 2009, due to complaints of excessive daytime sleepiness.  (Tr. 348-49).  Dr. Choudhary indicated that the study was consistent with obstructive sleep hypopnea[24] and insomnia.  (Tr. 349).  He recommended that plaintiff use a C-PAP machine, lose weight, manage her depression, and improve her sleep hygiene.  (Id.).  Plaintiff underwent a sleep study on July 15, 2009, at which time significant improvements were noted with use of the C-PAP.  (Tr. 557).

Plaintiff saw Dr. Domanska on May 26, 2009, at which time it was noted that plaintiff was

---

[22]Topamax is indicated for the treatment of seizures and migraine headaches.  See WebMD, http://www.webmd.com/drugs (last visited June 10, 2013).

[23]Operative correction of a damaged middle ear.  See Stedman's at 2058.

[24]Breathing that is shallower or slower than normal.  See Stedman's at 936.

feeling depressed, her mood was generally stable, and her anxiety was under control. (Tr. 332). Dr. Domanska increased plaintiff's Trazodone to help her sleep. (Id.). On July 7, 2009, plaintiff reported that her depression was under control, her mood was stable, and her anxiety was under control. (Tr. 447).

Plaintiff underwent an annual assessment at Pathways on August 4, 2009, performed by Fran Tatkenhorst, MA. (Tr. 449-62). Plaintiff reported that her anxiety was worse, her depression was worse, she experiences hallucinations when her anxiety is increased, and she experiences panic attacks one to two times a week. (Tr. 450-51). Upon mental status examination, plaintiff was excessively fidgety; her mood was within normal limits; her affect was constricted, flat, and blunted; and her memory was impaired. (Tr. 451-52). Plaintiff was diagnosed with major depressive disorder recurring with psychotic features, PTSD, and a GAF score of 50. (Tr. 457-58). It was noted that plaintiff's depression and anxiety were worse this year due to the stress plaintiff was experiencing regarding her son. (Tr. 459). Plaintiff had been using food to keep her anxiety under control the past few months and had gained over thirty pounds. (Id.). Plaintiff wanted to work on a diet to lose weight, learn skills to control her mood and depression, and find activities to fill her day. (Id.).

Plaintiff saw Dr. Domanska on August 20, 2009, at which time plaintiff reported that her depression was generally under control and her mood was stable. (Tr. 463).

Mark Altomari, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique on September 3, 2009, in which he expressed the opinion that plaintiff had a moderate limitation in her ability to maintain social functioning and a mild limitation in her ability to maintain concentration, persistence, or pace. (Tr. 369). Dr. Altomari also completed a Mental

Residual Functional Capacity Assessment, in which he found that plaintiff had moderate limitations in her ability to maintain attention and concentration for extended periods; work in coordination with or proximity to others without being distracted by them; interact appropriately with the general public; and respond appropriately to changes in the work setting. (Tr. 373-74). With regard to plaintiff's functional capacity, Dr. Altomari stated that plaintiff has the ability to understand, remember and carry out complex instructions, relate appropriately to co-workers and supervisors in small numbers and for short periods of time, adapt to most usual changes common to a competitive work environment, and make simple work-related decisions. (Tr. 375).

On September 15, 2009, plaintiff underwent x-rays of the lumbar spine, which were unremarkable. (Tr. 377). Plaintiff also underwent x-rays of the right wrist, which revealed a posttraumatic misalignment of the radiocarpal joint without other abnormality. (Tr. 378).

Plaintiff reported that her depression was under control and her mood was stable on September 30, 2009, November 11, 2009, and January 28, 2010. (Tr. 465, 467, 469). On April 6, 2010, plaintiff reported that she was feeling depressed, tired, had low motivation, and was experiencing some anxiety. (Tr. 471). Plaintiff denied having any hallucinations. (Id.). Dr. Domanska discontinued plaintiff's Paxil and started her on Effexor[25] to better control her symptoms. (Id.).

On August 13, 2010, plaintiff saw Joseph M. Long, Ph.D. for a psychological evaluation at the request of the state agency. (Tr. 587-90). Dr. Long indicated that no formal psychological testing was conducted and no background information was available for review at the time of the

---

[25]Effexor is an antidepressant indicated for the treatment of major depressive disorder and generalized anxiety disorder. See PDR at 3196.

exam. (Tr. 587). Plaintiff's Pathways case worker transported her to the exam. (Id.). Plaintiff reported that she only drives in her home area because driving distances makes her nervous. (Id.). Upon examination, plaintiff was able to recall one of three items she was asked to remember in a test of short-term memory; she completed the serial 4 addition task very slowly but with no errors; she attempted the serial 7 subtraction task without success; she reported hearing voices that tell her to hurt people and seeing people who are not there; her affect was generally constricted and dysphoric; she was anergic and very slow-spoken; she appeared anxious and had trouble with word finding; her thought process was simple and concrete; her case worker had to provide her list of medications because she does not keep track of them; she was an adequate historian but not a rich one; and her intellect was estimated to be in the borderline range. (Tr. 587-88). Plaintiff reported a history of sexual abuse by her father until the age of fourteen, and a history of special education. (Tr. 588). Plaintiff's health aide takes care of all of plaintiff's basic household chores. (Tr. 590). Plaintiff does not socialize except with her husband because she gets anxious in crowds. (Id.). Dr. Long diagnosed plaintiff with major depressive disorder with psychotic features by history, PTSD, anxiety disorder NOS, avoidant and dependant personality disorder,[26] learning disorders NOS by history, and probable borderline intellectual functioning. (Id.).

    Dr. Long completed a Medical Source Statement of Ability to Do Work-Related

---

[26]Avoidant personality disorder is an enduring and pervasive pattern in adulthood characterized by hypersensitivity to rejection, humiliation, shame, feelings of inadequacy resulting in social inhibition, and an unwillingness to enter into relationships without unusually strong guarantees of uncritical acceptance. Stedman's at 568. Dependent personality disorder is an enduring and pervasive pattern in adulthood characterized by submissive and clinging behavior and excessive reliance on others to meet one's emotional, social, or economic needs. Id.

Activities (Mental), in which he expressed the opinion that plaintiff had marked limitations in her ability to understand and remember complex instructions, carry out complex instructions, make judgments on complex work-related decisions, interact appropriately with the public, interact appropriately with supervisors, interact appropriately with co-workers, and respond appropriately to usual work situations and changes in a routine work setting. (Tr. 591-92). Dr. Long found that plaintiff had mild limitations in her ability to understand and remember simple instructions, carry out simple instructions, and make judgments on simple work-related decisions. (Tr. 591). Dr. Long stated that plaintiff has a history of special education placement and is likely functioning in the borderline range intellectually, and that her psychiatric illness and psychotropic regimen serve to further slow cognitive processing. (Id.). Dr. Long stated that plaintiff has a very constricted range of activities and becomes highly anxious when out of her limited familiar world. (Tr. 592).

On September 9, 2010, Dr. Domanska completed a Medical Assessment of Ability to Do Work-Related Activities (Mental), in which she expressed the opinion that plaintiff's ability to follow work rules; relate to co-workers; deal with work stresses; understand, remember and carry out complex job instructions; and understand, remember, and carry out detailed but not complex instructions was "poor or none." (Tr. 594-95). Dr. Domanska found that plaintiff's ability to deal with the public; use judgment; interact with supervisors; function independently; maintain attention/concentration understand, remember, and carry out simple job instructions; behave in an emotionally stable manner; relate predictably in social situations; and demonstrate reliability was "fair." (Tr. 594). Dr. Domanska stated that plaintiff has major depressive disorder with psychiatric features, a high anxiety level, is not able to deal with the public, is easily

decompensated under stress, has problems with making decisions, has an impaired memory, and has poor focus and concentration. (Id.). Dr. Domanska stated that plaintiff is getting very anxious around people. (Tr. 595).

## C.     Other Evidence

School records indicate that plaintiff underwent school and college ability testing in January 1980, which revealed a verbal score in the eleventh percentile, a quantitative score in the nineteenth percentile, and a raw score in the twelfth percentile. (Tr. 225). Plaintiff graduated from high school on May 22, 1981, and was ranked 63 out of 63. (Tr. 224).

Anna French, plaintiff's Case Manager, completed a Statement of Claimant or Other Person on September 14, 2010. (Tr. 605-06). Ms. French indicated that she had been working with plaintiff through Pathways since May 2010, although plaintiff had been receiving services through Pathways since August 2006. (Tr. 605). Ms. French stated that plaintiff has a "lot of difficulty dealing with her depressive symptoms to the point where it interferes with her daily functioning." (Id.). Ms. French stated that plaintiff's self-esteem is so low that it inhibits her from expressing her feelings with anyone, including staff at Pathways. (Id.). Ms. French stated that plaintiff has spoken to Pathways staff about the physical and sexual abuse she has endured and the effect it has had on her life. (Id.). Ms. French indicated that the following limitations were found at this year's evaluation: unable to express anger appropriately, cope with conflict, express differences of opinion, easily exploited, unable to initiate interaction, adapt to change, cook, cope emotionally to change, deal with correspondence, make friendships, make decisions, manage finances, participate in recreation or leisure activities, relate to strangers, or perform work or work-like activities. (Id.).

# The ALJ's Determination

The ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2010.

2. The claimant has not engaged in substantial gainful activity since the alleged onset date (20 CFR 404.1571 *et seq.*).

3. Since the alleged onset date of disability, July 24, 2007, the claimant has had the following severe impairments: major depressive disorder, post-traumatic stress disorder, anxiety disorder, bilateral carpal tunnel syndrome, degenerative joint disease of the right wrist, lumbar spine spondylolisthesis, asthma, right-sided hearing loss, headaches and obesity (20 CFR 404.1520(c)).

4. Since the alleged onset date of disability, July 24, 2007, the claimant has not had an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that prior to August 1, 2009, the date the claimant became disabled, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) (i.e., lift and carry 20 pounds occasionally and 10 pounds frequently; sit for six hours out of an eight hour work day; stand and walk for six hours out of an eight hour work day) except she cannot crawl or climb ladders, ropes or scaffolds. She could not use her right hand for continuous handling or fingering. She could not be exposed to excessive noise, and could only have occasional exposure to hazards and dust, fumes, gases, etc. She was able to understand, remember and carry out short simple instructions; perform routine, predictable tasks, not in a fast paced production environment. She could make only simple decisions. She could not have contact with the general public and have only occasional contact with co-workers and supervisors.

6. After careful consideration of the entire record, the undersigned finds that beginning on August 1, 2009, the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) (i.e., lift and carry 20 pounds occasionally and 10 pounds frequently; sit for six hours out of an eight hour work day; stand and walk for six hours out of an eight hour work day) except she cannot crawl or climb ladders, ropes or scaffolds. She cannot use her right hand for continuous handling or fingering. She cannot be exposed to excessive noise, and can have only occasional exposure to hazards and dust, fumes, gases, etc. She is able to understand, remember and carry out short simple instructions;

perform routine, predictable tasks, not in a fast paced production environment. She can make only simple decisions. She should not have contact with the general public, and have only occasional contact with co-workers and supervisors. She would miss three or more workdays during the month; and is unable to concentrate or stay on task at least 20 percent of the time.

7.      Since July 24, 2007, the claimant has been unable to perform any past relevant work (20 CFR 404.1565).

8.      Prior to the established disability onset date, the claimant was a younger individual age 18-49. The claimant's age category has not changed since the established disability onset date (20 CFR 404.1563).

9.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

10.     Prior to August 1, 2009, transferability of job skills was not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant was "not disabled" whether or not the claimant had transferable job skills. Beginning on August 1, 2009, the claimant has not been able to transfer job skills to other occupations (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

11.     Prior to August 1, 2009, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569a).

12.     Beginning on August 1, 2009, considering the claimant's age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c) and 404.1566).

13.     The claimant was not disabled prior to August 1, 2009, but became disabled on that date and has continued to be disabled through the date of this decision (20 CFR 404.1520(g)).

(Tr. 13-22).

The ALJ's final decision reads as follows:

Based on the application for a period of disability and disability insurance benefits filed on May 20, 2009, the claimant has been disabled under sections 216(I) and 223(d) of the Social Security Act beginning on August 1, 2009.

A determination to appoint a representative payee to mange payments in the claimant's interest is recommended.

(Tr. 22).


## Discussion

### A.      Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).  The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996).  "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary."  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry." Id.


### B.      The Determination of Disability

The Social Security Act defines disability as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a). The claimant has the burden of proving that s/he has a disabling impairment. See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial gainful employment." If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b). Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments. See 20 C.F.R §§ 404.1520 (c), 416.920 (c). To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities." Id. Age, education and work experience of a claimant are not considered in making the "severity" determination. See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). This listing is found in Appendix One to 20 C.F.R. 404. 20 C.F.R. pt. 404, subpt. P, App. 1. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). If it does not, however, the evaluation proceeds to the

next step which inquires into whether the impairment prevents the claimant from performing his or her past work. See 20 C.F.R. § 404.1520 (e), 416.920 (e). If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled. See id. If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if s/he is not able to perform any other work. See id. Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work. See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants with mental impairments. See 20 C.F.R. §§ 404.1520a (a), 416.920a (a). A special procedure must be followed at each level of administrative review. See id. Previously, a standard report entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision, although this is no longer required. See 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e); 65 F.R. 50746, 50758 (2000). Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council. See 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a,

416.920a.  The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists.  See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1).  If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2).  The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace.  See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3).  Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities.  See id.  Next, the Commissioner must determine the severity of the impairment based on those ratings.  See 20 C.F.R. §§ 404.1520a (c), 416.920a (c).  If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder.  See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2).  This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders.  See id.  If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment.  See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3); Pratt, 956 F.2d at 834-35; Jones v. Callahan, 122 F.3d 1148, 1153 n.5 (8th Cir. 1997).

**C.      Plaintiff's Claims**

Plaintiff first argues that the ALJ failed to properly consider the opinion of Dr. Russell. Plaintiff next argues that the ALJ failed to fully and fairly develop the record regarding plaintiff's

onset of disability date. Plaintiff also contends that the ALJ's RFC determination is not supported

by substantial evidence. Plaintiff finally argues that the ALJ erred in evaluating the credibility of

plaintiff's subjective allegations. The foundation of all of plaintiff's claims is the ALJ's assessment

of plaintiff's RFC prior to August 1, 2009, the date the ALJ found plaintiff became disabled.

Thus, the undersigned will first discuss the ALJ's RFC determination.

> The ALJ held as follows with regard to plaintiff's RFC:
>
> After careful consideration of the entire record, the undersigned finds that prior to
> August 1, 2009, the date the claimant became disabled, the claimant had the
> residual functional capacity to perform light work as defined in 20 CFR
> 404.1567(b) (i.e., lift and carry 20 pounds occasionally and 10 pounds frequently;  sit for
> six hours out of an eight hour work day; stand and walk for six hours out of          an eight hour
> work day) except she cannot crawl or climb ladders, ropes or                scaffolds.  She could
> not use her right hand for continuous handling or fingering.            She could not be exposed to
> excessive noise, and could only have occasional                exposure to hazards and dust, fumes,
> gases, etc.  She was able to understand,                remember and carry out short simple
> instructions; perform routine, predictable                tasks, not in a fast paced production
> environment.  She could make only simple                decisions.  She could not have contact with
> the general public and have only                occasional contact with co-workers and supervisors.

(Tr. 16).

RFC is what a claimant can do despite her limitations, and it must be determined on the

basis of all relevant evidence, including medical records, physician's opinions, and claimant's

description of her limitations. Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001). Although

the ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant

evidence, a claimant's RFC is a medical question. Hutsell v. Massanari, 259 F.3d 707, 711 (8th

Cir. 2001) (citing Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)). Therefore, an ALJ is

required to consider at least some supporting evidence from a medical professional. See Lauer,

245 F.3d at 704 (some medical evidence must support the determination of the claimant's RFC);

Casey v. Astrue, 503 F.3d 687, 697 (the RFC is ultimately a medical question that must find at least some support in the medical evidence in the record). An RFC determination made by an ALJ will be upheld if it is supported by substantial evidence in the record. See Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006).

As support for his findings regarding plaintiff's physical limitations, the ALJ noted that despite plaintiff's diagnosis of lumbar spondylolisthesis and scoliosis, these impairments have had little effect on plaintiff's ability to ambulate. (Tr. 17). The ALJ noted that during a 2006 examination, plaintiff had an essentially normal gait with an ability to heel-and-toe walk, and a negative straight leg raise. (Tr. 17, 229). The ALJ stated that the lifting restrictions to the light exertional level are supported by plaintiff's upper extremity impairments. (Tr. 17). The ALJ noted the abnormal findings in plaintiff's right wrist, specifically the misalignment of the radiocarpal joint; a December 2008 examination showing normal muscle strength and hand grip bilaterally; and mild bilateral carpal tunnel findings from January 2009. (Tr. 17, 378, 356). The ALJ also indicated that he was factoring plaintiff's asthma and obesity in his RFC findings. (Tr. 18). Finally, the ALJ indicated that he was assigning "great weight" to the assessment of the "state agency decision maker, Jennifer Dunlap." (Tr. 19). The ALJ stated that, although Ms. Dunlap is not an acceptable medical source, her assessment is consistent with the record as a whole with regard to plaintiff's physical limitations. (Id.).

Plaintiff argues that the ALJ erred in failing to consider the opinion of Dr. Garth Russell. Dr. Russell, of Columbia Orthopaedic Group, examined plaintiff on June 9, 2006. (Tr. 228-36). Dr. Russell also reviewed plaintiff's medical records and obtained x-rays of plaintiff's lumbar spine and right wrist. Dr. Russell diagnosed plaintiff with: comminuted, displaced fracture, right

distal radius; open reduction, internal fixation secondary to above; carpal tunnel syndrome, right wrist secondary to above; and acute and chronic lumbosacral strain, superimposed upon pre-existing spondylolisthesis, healed with moderate residual impairment. (Tr. 233). Dr. Russell stated that plaintiff's wrist fracture left her with significant loss of motion and strength in the right, dominant wrist. (Tr. 234). Dr. Russell noted that plaintiff also experiences intermittent numbness to her fingers. (Id.). Dr. Russell stated that, in his opinion, plaintiff would eventually need surgical decompression. (Id.). Dr. Russell stated that plaintiff's acute and chronic lumbosacral strain is made much more severe secondary to the fact that she has a congenital absence of two of the main support bones in the lower back with a spondylolysis and forward slipping at the L5-S1 area. (Tr. 235). Dr. Russell stated that plaintiff's back impairment permanently restricts her ability to stand, sit, or put any stress on her lower back. (Id.). Dr. Russell expressed the opinion that plaintiff would be unable to pursue gainful employment. (Id.).

Although the ALJ referenced some of Dr. Russell's findings on examination, he did not discuss any of Dr. Russell's opinions regarding plaintiff's ability to work. Defendant argues that Dr. Russell's opinion was found not credible in a prior decision that plaintiff chose not to appeal. Defendant contends that, because plaintiff did not appeal the prior decision, this court does not have jurisdiction to evaluate the opinion of Dr. Russell. The undersigned disagrees. An ALJ is "entitled to consider all of the evidence of record," including evidence prior to plaintiff's alleged onset date. Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005).

The ALJ erred in determining plaintiff's physical RFC. The ALJ failed to discuss the opinions of Dr. Russell, who was the only examining physician to express an opinion regarding plaintiff's work-related limitations. Instead, the ALJ indicated that he was assigning "great

weight" to the opinion of a non-physician single decisionmaker. (Tr. 19). The ALJ erred in relying on the opinion of the single decisionmaker. See Andreatta v. Astrue, 2012 WL 1854749, *10 (W.D. Mo. May 21, 2012) (holding remand required when ALJ relied on the opinion of a single decisionmaker, even if the RFC would be permissible absent consideration of single decisionmaker's report).

With regard to plaintiff's mental RFC, the ALJ concluded that plaintiff's mental impairments prior to August 1, 2009 were not "such so as to preclude the ability to sustain full-time competitive employment." (Tr. 18). As support for this finding, the ALJ noted that plaintiff was consistently fully oriented with fair insight and judgments during examinations. (Id.). The ALJ stated that plaintiff's auditory and visual hallucinations were controlled, and plaintiff reported that her depression and anxiety were under control. (Id.). The ALJ indicated that his RFC findings were based on the "findings and symptoms in [plaintiff's] mental health treatment records since her alleged onset date to July 31, 2009." (Id.). With regard to the opinion evidence, the ALJ indicated that he was assigning "little weight" to the opinion of state agency psychologist Mark Altomari. (Tr. 19).

The ALJ's mental RFC determination is not supported by substantial evidence. The ALJ cited some instances on which plaintiff reported that her depression or anxiety was under control. (Tr. 326, 328, 330). On the majority of office visits during this period, however, plaintiff reported significant symptoms. For example, the following findings were noted during plaintiff's visits with treating psychiatrist Dr. Domanska: in August of 2007, plaintiff reported feeling down and anxious; in September 2007, plaintiff reported worrying about her son; in October 2007, plaintiff reported feeling down, worrying a lot, having anxiety, and feeling hopeless; in May 2008, plaintiff

reported that she worried about her son; in July 2008, Dr. Domanska noted that plaintiff's mood was less stable, she was more emotional, irritable, and did not feel safe around her son; in August 2008, plaintiff reported being worried about her son, experiencing mood swings, and anxiety; in December 2008, plaintiff reported that she was more depressed; in March 2009, plaintiff reported mood swings; and in May 2009, plaintiff reported feeling depressed. (Tr. 314, 316, 318, 416, 418, 416, 418, 433, 326, 330, 332). At plaintiff's August 2007 annual assessment, plaintiff reported that her depression had slightly improved, but she still experienced anxiety and panic attacks. (Tr. 525). Upon mental status examination, plaintiff's affect was constricted, flat, and blunted, and her memory was impaired. (Tr. 526-27). Plaintiff was diagnosed with major depression with psychotic features, PTSD, and was assessed a GAF score of 50. (Tr. 532-33). Dr. Domanska prescribed and regularly adjusted multiple psychotropic drugs to manage plaintiff's symptoms. At her August 2008 annual assessment, plaintiff reported that her depression had improved, but she was experiencing visual and auditory hallucinations about once a week, during which she heard or saw people that were not there. (Tr. 421). Plaintiff also reported experiencing panic attacks about twice a week. (Id.). Upon mental status examination, plaintiff's affect was constricted, flat, and blunted; and her memory was impaired. (Tr. 422). Plaintiff's diagnoses, including her GAF score, remained unchanged. (Tr. 428-29). Finally, on October 9, 2008, nurse practitioner Ms. Bartholomew noted that plaintiff's affect was depressed, and that she had a poor attention span and concentration characterized as a "slow response." (Tr. 252).

The evidence discussed above reveals that plaintiff continued to suffer from significant psychiatric symptomatology, even with treatment. The evidence does not support the ALJ's

finding that plaintiff's depression and anxiety were under control. In addition, none of plaintiff's treating mental health providers expressed an opinion regarding plaintiff's work-related limitations during this period. The treatment notes of plaintiff's treating psychiatrist and other medical providers, however, reveal that plaintiff experienced psychiatric symptoms that would be expected to interfere with plaintiff's ability to function in the workplace. Thus, the ALJ's mental RFC is not supported by substantial evidence.

The ALJ found that on August 1, 2009, plaintiff would miss three or more workdays during the month; and is unable to concentrate or stay on task at least twenty percent of the time. (Tr. 19). The ALJ determined that there are no jobs that exist in significant numbers in the national economy that plaintiff can perform with this RFC, and that plaintiff was therefore disabled beginning on August 1, 2009. Plaintiff argues that the ALJ failed to fully and fairly develop the record regarding plaintiff's onset of disability date.

"In determining the date of onset of a disability, the ALJ should consider the claimant's alleged date of onset, his work history, and the medical and other evidence of his condition." Karlix v. Barnhart, 457 F.3d 742, 747 (8th Cir. 2006) (citing Grebenick v. Chater, 121 F.3d 1193, 1200 (8th Cir. 1997) and Social Security Ruling 83-20 (Social Security Administration 1983)). "If the medical evidence regarding onset is ambiguous, however, the ALJ should obtain an expert opinion from a medical advisor to determine a medically reasonable date of onset." Id. See also Grebenick, 121 F.3d at 1201 (noting that Social Security Ruling 83-20 requires the services of a medical advisor if the medical evidence of onset is ambiguous and there is no contemporaneous medical documentation).

In support of his determination regarding plaintiff's disability onset date, the ALJ cited

plaintiff's August 2009 annual assessment at Pathways, the findings of consultative psychologist Dr. Long, the treatment notes of Dr. Domanska, as well as plaintiff's reports regarding her daily activities. (Tr. 19-20). While this evidence supports the ALJ's finding of disability, the medical evidence discussed above suggests plaintiff was experiencing psychiatric symptoms prior to August 1, 2009 as well. The ALJ's use of August 1, 2009 as an onset date is not supported by substantial evidence on the record as a whole. Cf. Karlix, 457 F.3d at 747 (affirming ALJ's determination of alleged onset date when claimant alleged an onset date of August 2001 but did not seek medical treatment for condition prior to April 2002 and record was devoid of any other evidence suggesting an earlier date of onset).

The ALJ relied in large part on Dr. Long's August 13, 2010 examination and opinions, which are consistent with disability. (Tr. 587-90). Dr. Long noted the following findings on examination: deficits in plaintiff's memory; plaintiff reported hearing voices and seeing people; plaintiff's affect was constricted and dysphoric; plaintiff was anergic and very slow-spoken; plaintiff appeared anxious and had trouble with word finding; plaintiff's thought process was simple and concrete; and plaintiff's intellect was estimated to be in the borderline range. (Tr. 587-88). Dr. Long completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental), in which he expressed the opinion that plaintiff had marked limitations in the majority of work-related areas. (Tr. 591-92). Dr. Long, however, did not express an opinion regarding the onset of plaintiff's limitations. The ALJ acknowledged during the hearing that Dr. Long did not provide an onset date and that he was "concerned about the onset." (Tr. 34). In addition, Dr. Long indicated that he had no records to review, and that he did not perform any psychological testing. (Tr. 587).

Under these circumstances, the ALJ should have further developed the record regarding plaintiff's onset of disability date. Records from plaintiff's treating psychiatrist Dr. Domanska as well as other providers dated prior to August 1, 2009 note findings similar to those of Dr. Long, such as deficits in memory, complaints of hearing voices and seeing people, anxiety, and an abnormal affect. In fact, as plaintiff points out, the treatment notes of Dr. Domanska suggest that plaintiff's condition improved after August 2009. For example, plaintiff reported that her depression was under control and her mood was stable on August 20, 2009, September 30, 2009, November 11, 2009, and January 28, 2010. (Tr. 463, 465, 467, 469). The medical evidence concerning plaintiff's onset date of disability is ambiguous, and the ALJ was required to consult a medical advisor in making the determination of the onset date. SSR 83-20, 1983 WL 31249, at *3; Grebenick, 121 F.3d at 1200-01.

Finally, plaintiff contends that the ALJ did not properly evaluate plaintiff's subjective allegations under the standard set out in Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Polaski requires the consideration of: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions. 739 F.2d at 1322.

The ALJ found that plaintiff's allegations regarding her limitations were not credible prior to August 1, 2009 to the extent they were inconsistent with the ALJ's RFC assessment. (Tr. 17). The ALJ stated that the severity of plaintiff's mental impairments prior to August 1, 2009 was not such so as to preclude the ability to sustain full-time competitive employment. (Tr. 18). In support of this finding, the ALJ discussed the medical evidence and plaintiff's daily activities. (Tr. 18). As previously discussed, the ALJ's finding that plaintiff's depression and anxiety were under

control during this period is not supported by the medical record.

With regard to plaintiff's daily activities, the ALJ found that plaintiff's activities during this period are consistent with the ALJ's RFC finding. (Tr. 18). The ALJ pointed out that plaintiff indicated in a June 2009 function report that she was able to perform household chores such as cooking and laundry, tending to her personal needs, shopping, and operating an automobile. (Tr. 18, 182-85). The ALJ did not, however, note that plaintiff also reported in her function report that she did not go out by herself, she did not like crowds, and she was unable to get along with family and friends due to her depression. (Tr. 186-87). The ALJ also did not consider other relevant Polaski factors, such as the dosage and side effects of plaintiff's medications.

The Eighth Circuit has "repeatedly stated that a person's ability to engage in personal activities such as cooking, cleaning or a hobby does not constitute substantial evidence that he or she has the functional capacity to engage in substantial gainful activity." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000). The ALJ's credibility analysis, which was based solely on plaintiff's minimal daily activities and an erroneous finding that plaintiff's depression and anxiety were under control prior to August 1, 2009, is not supported by substantial evidence.

In sum, the ALJ erred in performing a faulty credibility analysis, assessing an RFC that was not based on substantial evidence, and failing to develop the record regarding the onset date of plaintiff's disability. Accordingly, the undersigned recommends that this matter be reversed and remanded to the ALJ in order for the ALJ to properly assess plaintiff's credibility, consider the opinion of Dr. Russell, and further develop the record regarding the onset of plaintiff's disability.

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that pursuant to sentence four of 42 U.S.C. § 405 (g), the decision of the Commissioner be **reversed** and this case be **remanded** to the Commissioner for further proceedings consistent with this Report and Recommendation.

The parties are advised that they have fourteen days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636 (b) (1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.

Dated this 18th day of July, 2013.

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE